PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1952
_____

THE CONSTITUTION PARTY OF PENNSYLVANIA;
THE GREEN PARTY OF PENNSYLVANIA; THE
LIBERTARIAN PARTY OF PENNSYLVANIA; JOE
MURPHY; JAMES N. CLYMER; CARL J. ROMANELLI;
THOMAS ROBERT STEVENS; KEN KRAWCHUK,
Appellants

v.

CAROL AICHELE; JONATHAN M. MARKS; ATTORNEY
GENERAL PENNSYLVANIA

CAROL SIDES; RICHARD J. TEMS; LOUIS NUDI;
DAMON KEGERISE; ANNE LAYNG; JUDITH GUISE,

(Intervenor-Defendants)
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-12-cv-02726)
District Judge:  Hon. Lawrence F. Stengel
_____

Argued
March 6, 2014

Before:   AMBRO, JORDAN and ROTH, *Circuit Judges*.

(Filed: July 9, 2014)
_____

Oliver B. Hall   [ARGUED]
Center for Competitive Democracy
1835 16th St. N.W.
Washington, DC   20009
    *Counsel for Appellants*

Sean A. Kirkpatrick
Sarah C. Yerger
Office of Attorney General of Pennsylvania
Strawberry Square – 15th Fl.
Harrisburg, PA   17120

Claudia M. Tesoro   [ARGUED]
Office of Attorney General of Pennsylvania
21 S. 12th St.
Philadelphia, PA   19107
    *Counsel for Appellees, Carol Aichele,*
    *Jonathan M. Marks, Attorney General Pennsylvania*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

The Appellants, political groups in Pennsylvania and several of their supporters, have invoked 42 U.S.C. § 1983 to challenge the constitutionality of two provisions of Pennsylvania's election code that regulate ballot access, namely title 25, sections 2911(b) and 2937 of Pennsylvania's Consolidated Statutes. Section 2911(b) and a similar section, § 2872.2(a), require that candidates seeking to be included on the general election ballot – other than Republicans and Democrats – must submit nomination papers with a specified number of signatures. Section 2937 allows private actors to object to such nomination papers and have them nullified, and it further permits a Pennsylvania court, as that court deems "just," to impose administrative and litigation costs on a candidate if that candidate's papers are so rejected. The Appellants contest an order of the United States District Court for the Eastern District of Pennsylvania dismissing their Complaint for lack of standing. We conclude that they do have standing to pursue their constitutional claims, and we will therefore reverse.

## I.  Factual Background and Procedural History[1]

The Appellants are the Constitution Party of Pennsylvania ("Constitution Party"), the Green Party of Pennsylvania ("Green Party"), and the Libertarian Party of Pennsylvania ("Libertarian Party") (collectively, the "C.G.L. Parties"); their respective chairmen – Joe Murphy, Carl Romanelli, and Thomas Robert Stevens; James Clymer, a

---

[1] In accordance with our standard of review, see *infra* note 12, we set forth the facts in the light most favorable to the Appellants.

3

member of the Constitution Party; and Ken Krawchuk, a former candidate of the Libertarian Party. For ease of reference we will refer to the Appellants collectively as the "Aspiring Parties."[2] They filed the instant suit against the Secretary of the Commonwealth of Pennsylvania, Carol Aichele; the Commissioner of the Pennsylvania Bureau of Commissions, Elections, and Legislation, Jonathan M. Marks; and the Pennsylvania Attorney General (collectively, the "Commonwealth") in their official capacities only.[3]

---

[2] Finding a shorthand term for the Appellants has been a challenge. "Minor political parties" is a statutorily defined term in Pennsylvania. 25 Pa. Cons. Stat. § 2872.2(a). Despite referring to themselves as the "Minor Parties," the organizational Appellants are in fact not minor parties but are "political bodies" for purposes of the election code because, as more fully explained herein, they did not attain a statutory threshold of votes in the 2010 election. The term "party" also has an equivocal character, indicating both a political party and a litigant in a lawsuit. Thus, we have created our own term. We use it only to capture the idea that both the individual Appellants and the organizational Appellants aspire to full political participation.

[3] When the Complaint was filed, the Attorney General was Linda L. Kelly. The current Attorney General is Kathleen G. Kane. The Commonwealth argues that the Attorney General should not have been named as a defendant because she "does not have a discrete role in administering the Pennsylvania Election Code." (Appellees' Br. at 33.) We agree. The Aspiring Parties' Complaint only asserts that the Attorney General is the "chief legal and law enforcement officer" of Pennsylvania, and it makes no allegations regarding her role in the electoral process. (J.A. at 35.)

4

To understand the parties' dispute, a brief sketch of the statutory background is necessary.

## A.    Pennsylvania's Electoral Scheme

Pennsylvania's election code distinguishes between "political parties" and "political bodies."  25 Pa. Cons. Stat. § 2831.  An organization qualifies as a "political party" if one of its candidates polled at least two percent of the largest entire vote cast in each of at least ten counties and "polled a total vote in the State equal to at least two per centum of the largest entire vote cast in the State for any elected candidate." *Id*. § 2831(a).  Political parties may in turn be categorized as either major or minor parties, depending on their statewide voter registration.  *Id*. §2872.2(a); *Rogers v. Corbett*, 468 F.3d 188, 190-91 (3d Cir. 2006).  Major parties are defined by exclusion as those that are not minor political parties under the election code, and minor parties are defined as those whose statewide registration is less than fifteen percent of the total statewide registration for all political parties.  25 Pa. Cons. Stat. § 2872.2(a).  At present, there are only two major parties in Pennsylvania, the Democratic Party and the Republican Party, as has been the case since the election code was enacted more than three-quarters of a century ago. "Political bodies" are organizations that did not have a candidate who crossed the two-percent threshold in the last election, and so they do not qualify for the benefits of being a minor party, let alone a major one.  *Id*. § 2831(a).

---

Accordingly, we will direct that, on remand, all claims against the Attorney General be dismissed.

5

One of the most basic goals of a political organization, and the one for which the Aspiring Parties are contending in this case, is to have its candidates listed on the general election ballot. Major parties get to place their candidates on the general election ballot through a publicly-funded primary process.[4] *See id*. § 2862. Minor parties and political bodies (which we will sometimes refer to together as "non-major parties") have to go through a signature-gathering campaign to have their nominees appear on the general election ballot, but minor parties are at least able to access benefits under the election code "with respect to special elections, voter registration forms, [and] substituted nominations," *id*. § 2872.2. Ultimately, the distinction between minor parties and political bodies is of less consequence in this case than is the distinction between major parties and non-major parties, since all non-major parties face essentially the same fight to get their candidates on the ballot through the submission of nominating papers. It is the rules governing that process that are the focus of the Aspiring Parties' Complaint.

---

[4] To appear on the primary ballot, candidates from major parties must submit a certain number of valid signatures depending on the office sought. 25 Pa. Cons. Stat. § 2872.1. The largest number of signatures required for primary ballot access is 2,000 for candidates seeking offices such as President of the United States and Governor of the Commonwealth of Pennsylvania. *Id*. The winner of the primary election automatically appears on the general election ballot as the candidate of his or her respective major party. *Id*. § 2882.

To appear on the general election ballot, minor parties and political bodies are required to file nomination papers with the Secretary of the Commonwealth.[5] *See id.* §§ 2872.2 ("Nominations by minor political parties"), 2911 ("Nominations by political bodies"); *Rogers*, 468 F.3d at 191. Successful nomination papers for a statewide office must include valid signatures equal to two percent of the vote total of the candidate with the highest number of votes for any state-wide office in the previous election. 25 Pa. Cons. Stat. § 2911(b).[6] After being filed, the nomination papers are

---

[5] Although the Aspiring Parties refer to "nominating petitions," we will use the statutory term "nomination papers" found in § 2911. Under the election code, major party candidates file "nomination petitions" to appear on the primary ballot. 25 Pa. Cons. Stat. § 2872.1. However, candidates of minor political parties and political bodies file "nomination papers" to appear on the general election ballot. *Id.* §§ 2911(b), 2872.2. Although the terms are sometimes used interchangeably, as in certain quotes from the briefings and declarations before us, we will adhere to the statutory distinction as much as possible.

[6] 25 Pa. Cons. Stat. § 2911(b) provides in relevant part:

> Where the nomination is for any office to be filled by the electors of the State at large, the number of qualified electors of the State signing such nomination paper shall be at least equal to two per centum of the largest entire vote cast for any elected candidate in the State at large at the last preceding election at which State-wide candidates were voted for.

7

examined by the Secretary of the Commonwealth, who must reject the filing of any submission that "contains material errors or defects apparent on [its] face … or on the face of the appended or accompanying affidavits; or … contains material alterations made after signing without the consent of the signers; or … does not contain a sufficient number of signatures as required by law." *Id*. § 2936.

Even after being accepted by the Secretary, however, the papers can be subjected to further examination if a private party files an objection.[7] In particular, the election code provides in § 2937 that

> [a]ll nomination petitions and papers received and filed … shall be deemed to be valid, unless, within seven days after the last day for filing said nomination petition or paper, a petition is presented to the court specifically setting forth

---

25 Pa. Cons. Stat. § 2911(b). The non-major party candidates have approximately five months to circulate nomination papers from before the state-run primary to August 1 of the election year. *Rogers*, 468 F.3d at 191.

[7] This process also applies to the nomination petitions filed by major political parties to be placed on the primary ballot. 25 Pa. Cons. Stat. §§ 2936, 2937. The Pennsylvania Supreme Court has held that despite using the word "petition," § 2937 applies to both nomination petitions and nomination papers. *In re Nader*, 905 A.2d 450, 458 (Pa. 2006).

> the objections thereto, and praying that the said petition or paper be set aside.

*Id*. § 2937.  If any objections are filed pursuant to § 2937, the Commonwealth Court reviews and holds a hearing on the objections and determines whether the candidate's name will be placed on the ballot.[8]  *Id*.  Of special importance to the

---

[8] Section 2937 provides for the full process by which a nomination petition or nomination paper is challenged:

> A copy of said petition shall, within said period, be served on the officer or board with whom said nomination petition or paper was filed. Upon the presentation of such a petition, the court shall make an order fixing a time for hearing which shall not be later than ten days after the last day for filing said nomination petition or paper, and specifying the time and manner of notice that shall be given to the candidate or candidates named in the nomination petition or paper sought to be set aside. On the day fixed for said hearing, the court shall proceed without delay to hear said objections, and shall give such hearing precedence over other business before it, and shall finally determine said matter not later than fifteen (15) days after the last day for filing said nomination petitions or papers. If the court shall find that said nomination petition or paper is defective under the provisions of section 976, or does not contain a sufficient number of genuine signatures of electors entitled to sign the same

present dispute is that, when an objection is successful and a nomination petition or paper is dismissed, "the court shall make such order as to the payment of the costs of the proceedings, including witness fees, as it shall deem just." *Id*. The Pennsylvania Supreme Court has held that, under § 2937, "an award of costs … is not warranted solely on the basis that the party prevailed"; there must be some further reason, and it is an abuse of discretion for a lower court to award such costs "without identifying any reason specific to [the] case or … why justice would demand shifting costs to them." *In re Farnese*, 17 A.3d 357, 369-70 (Pa. 2011). At the same time, however, the court held that, while "fraud, bad faith, or gross misconduct … may require an award of costs," "a party's conduct need not proceed to such an extreme before" costs can be shifted. *Id*. at 372. Thus, under § 2937, costs may be awarded to the person opposing nomination papers if there is some showing that it would be "just" to do so, despite there

under the provisions of this act, or was not filed by persons entitled to file the same, it shall be set aside. If the objections relate to material errors or defects apparent on the face of the nomination petition or paper, the court, after hearing, may, in its discretion, permit amendments within such time and upon such terms as to payment of costs, as the said court may specify. In case any such petition is dismissed, the court shall make such order as to the payment of the costs of the proceedings, including witness fees, as it shall deem just.

25 Pa. Cons. Stat. § 2937 (footnote omitted).

10

being no "fraud, bad faith, or gross misconduct" on the part of the candidate whose papers were challenged.[9] *Id.*

Finally, a political organization may also lose its status as a political party. If it does not meet the two percent threshold, it descends again to the status of political body. *See* 25 Pa. Cons. Stat. § 2831(a). Therefore, if a political party fielded no candidate in a general election or if its candidates received support from less than two percent of the highest vote-getter, it would qualify only as a political body in the following election. *Id.*

Sections 2911 and 2937 became law in 1937. Section 2911 was amended in 1971 to increase the percentage of signatures required, *see People's Party v. Tucker*, 347 F. Supp. 1, 2 & n.2 (M.D. Pa. 1972), and § 2937 was, in 2011, the subject of an important interpretive opinion by the Pennsylvania Supreme Court, *In re Farnese*, 17 A.3d at 359. The Aspiring Parties have extensive experience with these statutes, having collected signatures, defended nomination papers, and been placed on and struck from election ballots at various times in the past decade.

### B. Recent Elections

---

[9] In *In re Nader*, the Pennsylvania Supreme Court determined that the language of § 2937 "discusses *both* nomination petitions and petitions to set aside a nomination petition. Thus, the court can impose costs, as justice requires, when either the nominating petition is set aside or the petition to set aside the nomination petition is dismissed." *In re Nader*, 905 A.2d at 458 (quoting *In re Lee*, 578 A. 2d 1277, 1279 n.3 (1990)).

In the 2002, 2004, and 2006 elections, the C.G.L. Parties were each "qualified minor parties … because each party had a candidate on the preceding general election ballot who polled the requisite number of votes." (Appellants' Opening Br. at 9.) In 2004, however, independent presidential candidate Ralph Nader and his running mate were ordered to pay $81,102.19 in costs under § 2937, following a court determination that their Pennsylvania "signature-gathering campaign involved fraud and deception of massive proportions." *In re Nader*, 905 A.2d 450, 460 (Pa. 2006). That ruling appears to mark the first time costs were ever imposed pursuant to § 2937, and the reverberations from that decision have been significant.

According to the Aspiring Parties, the *Nader* decision worked a transformation in how § 2937 is understood and applied. The threat of extraordinary costs like those involved in *Nader* "caused several minor party candidates either to withhold or withdraw their nomination petitions" during the 2006 election cycle. (J.A. at 39.) For example, in a declaration filed in this case, Appellant Krawchuk stated that, although the Libertarian Party nominated him as its candidate for United States Senate in 2006, he declined to run "due to the fact that … Ralph Nader and his running mate … had recently been ordered to pay $81,102.19." (*Id*. at 90-91.) Similarly, Christina Valente, the Green Party's nominee for Lieutenant Governor in 2006, stated in her declaration that, "after a challenge was filed against me …[,] I withdrew from the race. My decision to withdraw was based entirely on the fact that I was unwilling to assume the risk of incurring litigation costs pursuant to 25 P.S. § 2937." (*Id*. at 78.)

12

Thus in 2006, "only one minor party candidate [ran] for statewide office," Appellant Romanelli, the Green Party's nominee for United States Senate. (J.A. at 39) Based on the votes cast in the 2004 general election, Romanelli had to obtain 67,070 valid signatures to get on the ballot in 2006. He submitted 93,829 signatures but was removed from the ballot following a successful objection filed pursuant to § 2937 by private parties affiliated with the Democratic Party. Romanelli was ordered to pay costs totaling $80,407.56. *In re Rogers*, 942 A.2d 915, 930 (Pa. Commw. Ct. 2008). The Commonwealth Court found that costs were warranted due to the failure of Romanelli's campaign and the Green Party to comply with certain court orders, including an order to provide nine people to assist in the review of the nominating signatures[10] and an order to timely provide the court with the

---

[10] The review of the Romanelli signatures was facilitated by the Statewide Uniform Registry of Electors ("SURE") computer system. The Commonwealth Court ordered that

> [e]ach party shall have present at that time at least nine individuals, in addition to counsel, who are capable of performing computer searches. These individuals will be given a short training session by Department personnel on how to perform SURE system searches. With the assistance of court personnel, the designated individuals of each party shall commence a review of the challenged signatures and shall tabulate, with the assistance of counsel, the numbers of challenged signatures found to be valid and those found to be invalid.

13

"specifics of what stipulated invalid signatures [Romanelli] believed could be rehabilitated." *Id*. at 929.

Therefore, because of candidates withdrawing their nomination papers and the successful challenge to Romanelli's nomination papers, the C.G.L Parties fielded no candidates for statewide office in the 2006 election. That meant that, under 25 Pa. Cons. Stat. § 2831(a), none of the C.G.L. Parties qualified as minor parties leading up to the 2008 election. They became, instead, political bodies.

In the 2008 election, while the Libertarian Party was able to collect the requisite number of signatures – and those signatures went unchallenged – and to place candidates on the general election ballot, the Constitution and Green Parties were again unable to get any candidates on the ballot. The chairman of the Constitution Party stated in his declaration that, following the 2006 election, his party could not recruit any candidates "willing to submit nomination petitions and thereby risk incurring litigation costs pursuant to 25 P.S. § 2937." (J.A. at 53.) Supporters of that party were also unwilling to donate time and resources to electioneering. Likewise, the chairwoman of the Green Party in 2008 and 2010 stated that her party was unable to regain minor-party status because of the effect that § 2937 challenges and costs had on member morale. She declared that, as Statewide Petition Coordinator for 2012, she "continue[d] to encounter serious difficulty in recruiting petitioners," many of whom

*In re Rogers*, 942 A.2d 915, 920 (Pa. Commw. Ct. 2008).

14

refused to participate in nomination drives because they believe that § 2937 "renders petitioning futile." (*Id*. at 63.)

In 2010, the C.G.L. Parties again resumed the nomination signature gathering process. The Democratic and Republican parties or their "allies" were allegedly behind objections to the nomination papers of the Green and Libertarian Parties. (*Id*. at 41.) The Aspiring Parties point to a challenge to the Libertarian Party's nomination papers as an example of the kinds of threats of financial ruin used by the major parties to shut down competing political activity. The former chair of the Libertarian Party asserts that his party had submitted "more than the 19,056 valid signatures required" under § 2911(b) for its candidates for Governor, Lieutenant Governor, and United States Senator but that the party "withdrew the petitions after three Republican voters, aided by the Pennsylvania Republican Party, challenged them." (*Id*. at 83 (declaration of then-party chair Michael Robertson).) An email from the challengers' attorney, quoted in the Aspiring Parties' Complaint, was hardly subtle:

> Following up on our conversation earlier this morning, I do not have exact figures on what our costs would be if this signature count continues and my clients are required to complete the review and/or move forward with a hearing. However, a rough estimate would be $92,255 to $106,455 … . These costs are comparable to the costs awarded in recent years by the Commonwealth Court in similar nomination paper challenges … . Please let me know if you need any further information in order to discuss with your clients a withdrawal

15

of their candidacy… . As I stated, the sooner that your clients agree to withdraw the more likely my clients will agree to not pursue recovery of all their costs incurred in pursuing this matter.

(*Id*. at 87.)

The Libertarian Party candidates responded by withdrawing their nomination papers because "they were unable to assume the risk of incurring the costs," and the party "lacked the financial resources to indemnify them." (*Id*. at 84.) Accordingly, no Libertarian Party candidate appeared on the 2010 ballot.

The Green Party's 2010 United States Senate candidate, Melvin Packer, likewise withdrew his nomination papers following a challenge from Democratic senate candidate Joe Sestak because, Packer said, he "could not afford to have costs assessed against [him] pursuant to Section 2937." (*Id*. at 73.) The Constitution Party's nominee for Governor, John Krupa, "refused to submit [his] Nominating Papers" and "thereby risk incurring litigation costs pursuant to … § 2937." (*Id*. at 56.) As in 2006, "no candidate for statewide office, except the Republican and Democrat, appeared on Pennsylvania's 2010 general election ballot."[11] (*Id*. at 43.)

---

[11] The events of the 2012 election cycle are intertwined with the procedural history of this case and are accordingly addressed in the portion of the opinion dealing with that history. *See infra* Part I.D.

### C. Allegations Regarding Future Elections

The Aspiring Parties' Complaint and the accompanying declarations also contain allegations about the anticipated impact of Pennsylvania's electoral scheme on future elections. Those allegations include, but are not limited to, the following.

Appellant Krawchuk, the Libertarian Party nominee for United States Senate in 2006, declared that he would "no longer run for statewide office … as long as [he] must assume the risk of incurring costs pursuant to Section 2937." (J.A. at 91.) Despite being asked by party members, Krawchuk refused to run as the party's nominee in 2014 because § 2937 remains in effect.

Likewise, Kat Valleley, who was the Libertarian Party's 2010 nominee for Lieutenant Governor but withdrew her candidacy after an objection was filed, declared that "[she] will no longer run for office as a nominee of [the Libertarian Party], as long as [she] must assume the risk of incurring costs pursuant to Section 2937." (*Id*. at 97.)

In addition, the Aspiring Parties allege that candidates are not the only ones affected. Bob Small, Co-Chair of the Green Party's Delaware County Chapter and a nomination drive participant in 2004, 2006, 2008, and 2010, stated that he would not participate in any future petition drives as long as the party's candidates face the threat of litigation.

### D. Procedural History

17

The Aspiring Parties brought this action on May 17, 2012, in the middle of signature drives to place C.G.L. Party candidates on the 2012 general election ballot. They allege in their Complaint that "Pennsylvania's ballot access scheme violated rights guaranteed to them by the First and Fourteenth Amendments of the United States Constitution, by forcing them to assume the risk of incurring substantial financial burdens if they defend nomination petitions they are required by law to submit." (*Id.* at 31.) Count I alleges that §§ 2911(b) and 2937 violate the Aspiring Parties' "freedoms of speech, petition, assembly, and association for political purposes" under the First and Fourteenth Amendments by imposing substantial financial burdens on them to defend their nomination papers. (*Id.* at 46-47.) Count II alleges that §§ 2911(b) and 2937 violate the Aspiring Parties' right to equal protection under the Fourteenth Amendment by requiring them to bear the costs of validating nomination papers, while Republican and Democratic Party candidates are placed on the general election ballots automatically and by means of publicly funded primary elections. Count III alleges that § 2937 is unconstitutional on its face for authorizing the imposition of costs against candidates, even if they do not engage in misconduct, thereby chilling First Amendment rights to freedom of speech, petition, assembly, and association. The Aspiring Parties seek a declaratory judgment in keeping with their allegations, as well as injunctive relief to prevent the Commonwealth "from enforcing the signature requirement imposed by 25 P.S. § 2911(b)." (*Id.* at 50.) They attached 13 declarations to their Complaint and submitted an additional four declarations during the pendency of proceedings in the District Court.

18

On August 1, 2012, the C.G.L. Parties each submitted nomination papers to the Secretary of the Commonwealth as required under the election code. No objection was brought with respect to papers filed by the Green Party, but private individuals, who were eventually allowed to intervene as defendants in this case, challenged the nomination papers of the Constitution and Libertarian Parties. In response to those challenges, the Aspiring Parties filed a Motion for a Temporary Restraining Order or Preliminary Injunction in the District Court on the basis that the threat of costs would force them to withdraw the nomination papers if the challenges were allowed to proceed.

During the pendency of that motion, the Constitution Party withdrew from the election because, according to the Aspiring Parties, it was unable to comply with a state court order requiring that it provide 20 individuals to assist in the signature review process. On October 10, 2012, the Commonwealth Court found that the Libertarian Party had presented a sufficient number of valid signatures and dismissed the objection to its nomination papers.

The Commonwealth then filed a motion to dismiss this case under Rule 12(b) of the Federal Rules of Civil Procedure. The District Court granted the motion and dismissed the Complaint for lack of standing under Rule 12(b)(1). It denied the preliminary injunction motion as moot. This timely appeal followed.

## II. Discussion[12]

---

[12] We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. Whether the District Court had jurisdiction is the

19

Article III of the United States Constitution limits the scope of federal judicial power to the adjudication of "cases" and "controversies."  U.S. Const. art. III, § 2.  A fundamental safeguard of that limitation is the doctrine of standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").  Only a party with standing can invoke the jurisdiction of the federal courts.  At present, the only question for decision is whether the Aspiring Parties have standing – that is, do they even have the right to be heard.

We emphasize at the outset that we are not prejudging the merits of the case.  We do not minimize the precedent supporting a state's rational interest in preventing voter confusion, avoiding ballot clutter, and ensuring viable candidates by limiting ballot access.  *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (upholding Georgia's 5% signature requirement to appear on the general election ballot); *Rogers*, 468 F.3d at 195 (upholding § 2911(b)'s 2% signature requirement to appear on the general election ballot as a

---

issue before us.  We exercise plenary review over all jurisdictional questions, including those related to standing. *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003).  Because we are dealing with a facial challenge to jurisdiction, as more fully described herein, "we must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the complaining party." *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003).

minor party or political body); *cf. Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (upholding Hawaii's prohibition on write-in voting). Nor do we discount the potential success of the Aspiring Parties' First Amendment claims. *Cf. Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) ("A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on association choices protected by the First Amendment."); *Bullock v. Carter*, 405 U.S. 134, 149 (1972) (holding high filing fees collected to finance primary elections unconstitutional); *Belitskus v. Pizzingrilli*, 343 F.3d 632, 647 (3d Cir. 2003) (holding Pennsylvania's mandatory filing fees unconstitutional as applied to indigent candidates). It would be a sad irony indeed if the state that prides itself on being the cradle of American liberty had unlawfully restrictive ballot access laws. But we are not now concerned with which side may win – a fact that makes much of the Commonwealth's briefing beside the point. (*See, e.g.*, Appellees' Br. at 23 ("[T]he constitutionality of § 2911(b) is not open to debate … ."); *id.* at 40 ("[I]t is too late to question the validity of the statutory petition requirement."); *id.* at 42 ("This Court … has already upheld § 2911(b), and Pennsylvania courts have already found § 2937 constitutional.").) The merits of the Aspiring Parties' claims are not before us, and, with that in mind, we first consider the standard of review that the District Court should have applied in addressing the question of standing.

### A.     Rule 12(b)(1) Standard

The District Court dismissed the Aspiring Parties' Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure. "A motion to dismiss for want of standing is ...

21

properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir. 2007). A district court has to first determine, however, whether a Rule 12(b)(1) motion presents a "facial" attack or a "factual" attack on the claim at issue, because that distinction determines how the pleading must be reviewed. *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

A facial attack, as the adjective indicates, is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present. Such an attack can occur before the moving party has filed an answer or otherwise contested the factual allegations of the complaint. *See Mortensen*, 549 F.2d at 889-92 (noting the distinction between a facial attack and a "factual evaluation," which "may occur at any stage of the proceedings, *from the time the answer has been served* until after the trial has been completed." (emphasis added) (footnote omitted)). A factual attack, on the other hand, is an argument that there is no subject matter jurisdiction because the facts of the case – and here the District Court may look beyond the pleadings to ascertain the facts – do not support the asserted jurisdiction. So, for example, while diversity of citizenship might have been adequately pleaded by the plaintiff, the defendant can submit proof that, in fact, diversity is lacking. *See id.* at 891 ("[T]he trial court is free to weigh the evidence … and the existence of disputed material facts will not preclude the trial

22

court from evaluating for itself the merits of jurisdictional claims."). In sum, a facial attack "contests the sufficiency of the pleadings," *In re Schering Plough Corp.*, 678 F.3d at 243, "whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (internal quotation marks omitted) (alterations in original).

In reviewing a facial attack, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *In re Schering Plough Corp.*, 678 F.3d at 243 (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)) (internal quotation marks omitted). Thus, a facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party. *Id.* This is in marked contrast to the standard of review applicable to a factual attack, in which a court may weigh and "consider evidence outside the pleadings." *Gould Elecs. Inc.*, 220 F.3d at 176 (citing *Gotha v. United States,* 115 F.3d 176, 178-79 (3d Cir. 1997)).

The District Court here construed the Aspiring Parties' motion to dismiss as a "factual attack" and said that, "to the extent that certain of the plaintiffs' jurisdictional allegations are challenged on the facts, those claims receive no presumption of truthfulness." *Constitution Party v. Aichele*, No. 12-2726, 2013 WL 867183, at *4 (E.D. Pa. Mar. 8, 2013). That was error. The Commonwealth filed the attack before it filed any answer to the Complaint or otherwise

23

presented competing facts. Its motion was therefore, by definition, a facial attack. *Mortensen*, 549 F.2d at 892 n.17 ("A factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted."). A factual attack requires a factual dispute, and there is none here. *See Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700, 711 (3d Cir. 1982) ("[Defendant's] motion was supported by a sworn statement of facts. It therefore must be construed as a factual, rather than a facial attack … ."). As the Commonwealth itself said in its Answering Brief on appeal, "the actual facts of this case were not contested in any real sense." (Appellee's Br. at 27.) The motion was thus a facial attack on subject matter jurisdiction, and the Aspiring Parties were entitled to the more generous standard of review associated with such an attack. *Cf. Askew v. Church of the Lord Jesus Christ*, 684 F.3d 413, 417 (3d Cir. 2012) ("As the defendants had not answered and the parties had not engaged in discovery, the first motion to dismiss was facial."); *Mortensen*, 549 F.2d at 891 ("The facial attack does offer … safeguards to the plaintiff: the court must consider the allegations of the complaint as true."). The Commonwealth conceded the District Court's error in this regard, stating at oral argument that the motion to dismiss "was made initially as a facial attack." Oral Arg. Tr. at 36:14-15.

Nevertheless, the Commonwealth argues that the District Court's error was merely one of terminology and was harmless.[13] The Aspiring Parties point out obvious problems

---

[13] The Commonwealth also argues that, "[b]y filing their motion for injunctive relief, the [C.G.L. Parties] themselves caused this case to advance beyond the pleading

24

with that assertion. They rightly note that the District Court rejected some facts as "conjectural or hypothetical" and declared that it was "not persuaded" by certain allegations, *Constitution Party*, 2013 WL 867183, at *7, none of which could have occurred if the Court had accepted the allegations in the Complaint and the supporting declarations as true.[14] For instance, the Court stated that, "[a]lthough the plaintiffs blame their recruitment difficulties on the possibility of being assessed fees and costs, they provide nothing more than conjecture and conclusory assertions as support." *Id.* at *8. But that is simply not so. The Aspiring Parties provided 13 declarations, which, taken as true, establish that candidates from the C.G.L. Parties have not run for office precisely because of the threat that, under § 2937, they would be saddled with the high costs of litigating over nomination papers that must be submitted under § 2911(b). For example,

_____

stage" such that "the district court was entitled to take … additional information … into account in its standing analysis" and might have been justified in viewing the challenge to jurisdiction as a factual rather than facial attack. (Appellees' Br. at 26.) That reasoning is at odds with the Commonwealth's concession that the facts are not disputed. The Aspiring Parties' argument is that the District Court did not credit their factual allegations or the additional information in their declarations. That argument remains unrebutted.

[14] The Commonwealth is correct, however, that the District Court, while required to accept "factual assertions … [that] plausibly suggest an entitlement to relief," is not required to accept "bare assertions," *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009), or legal conclusions. *Id.* at 678.

25

Krawchuk, though he had been a candidate before, expressly declared that he would "no longer run for statewide office … as long as [he] must assume the risk of incurring costs pursuant to Section 2937." (J.A. at 91.)

Particularly telling is the District Court's comment that it was "not persuaded" by the allegations that "future candidates will be assessed costs." *Constitution Party*, 2013 WL 867183, at *7. The words "not persuaded" betray a foray into fact-finding which, in the review of a facial attack on subject matter jurisdiction, the District Court was not entitled to undertake. Moreover, the District Court misapprehended the Aspiring Parties' argument. It is not, as the Court viewed it, simply that future costs may be assessed, but rather that the threat of high costs has imposed, and will continue to impose, a real and chilling effect on political activity. The Aspiring Parties allege and have adduced proof –uncontroverted at this stage – that Pennsylvania's election scheme provoked, and will continue to provoke, costly major party challenges to the Aspiring Parties' efforts to field candidates.[15] The effects are not merely a matter of conjecture. Despite attaining minor-party status and a place on the ballot in 2008, all of the Libertarian Party candidates withdrew their 2010 nomination

---

[15] The likelihood of future legal challenges is hardly farfetched. The undisputed facts establish that the nomination papers of candidates representing one or more of the C.G.L. Parties have been challenged in all but one election cycle for the past decade. Taking that history in the light most favorable to the Aspiring Parties sufficiently establishes, for purposes of overcoming a facial attack, that they would face similar obstacles in the future.

26

papers after receiving a direct threat from a lawyer representing challengers allied with a major party.

The District Court did not review the Complaint in the light most favorable to the Aspiring Parties, and that resulted in an incorrect standing analysis. The question remains, however, whether the Aspiring Parties' allegations, if accepted, meet the legal requirements for standing. As that calls for a purely legal analysis, we proceed with it now rather than remanding the question to the District Court. *See Chester ex rel. NLRB v. Grane Healthcare Co.*, 666 F.3d 87, 100 (3d Cir. 2011) (declining to remand, despite the district court's legal error, where the undisputed facts in the record allowed for a conclusive analysis under the correct legal standard).

### B. Standing

"The standing inquiry … focuse[s] on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC,* 554 U.S. 724, 734 (2008). To establish that stake, a plaintiff must show three elements: injury-in-fact, causation, and redressability. In the seminal standing opinion *Lujan v. Defenders of Wildlife*, the Supreme Court described those elements as follows:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct

27

complained of – the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560-61 (alterations in original) (citations omitted). The same elements must be examined with respect to each individual claim advanced by the Aspiring Parties. *See In re Schering Plough Corp.*, 678 F.3d at 245 ("[A] plaintiff who raises multiple causes of action 'must demonstrate standing for each claim he seeks to press.'" (quoting *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006))).

In its review of the Complaint, the District Court relied heavily on our unreported decision in *Constitution Party of Pennsylvania. v. Cortes*, 433 F. App'x 89 (3d Cir. 2011).[16] In *Cortes*, the same political entities before us now, the C.G.L. Parties, filed a complaint in the United States District Court for the Eastern District of Pennsylvania that challenged, among other things, the constitutionality of § 2937.[17] *Id.* at

---

[16] We are cognizant of our Internal Operating Procedure No. 5.7, which states that "by tradition [we] do[] not cite to [our] not precedential opinions as authority." Here we do not cite *Constitution Party of Pennsylvania. v. Cortes*, 433 F. App'x 89 (3d Cir. 2011) because it serves as authority but because it is the foundation of the District Court's opinion, and, as such, we must refer to it.

[17] The plaintiffs in *Cortes* also challenged § 2872.2,

28

91. The district court dismissed the complaint on standing and ripeness grounds, and we affirmed on standing alone. *Id*. at 93. While *Cortes* included a challenge to § 2937 by some of the same parties before us now, it is without precedential effect. Even if it had precedential value, though, it presented quite different circumstances because the complaint in that case lacked the specificity and the supporting declarations present here, *see id*. at 93 ("[T]here is simply no allegation in the Amended Complaint, other than conclusory assertions … ."). Despite that crucial difference, the District Court adopted the analysis from *Cortes* and held that the Aspiring Parties cannot be heard because they did not establish the injury and causation elements of standing. *Constitution Party*, 2013 WL 867183, at *8.

The Aspiring Parties argue that the District Court erroneously dismissed their Complaint for lack of standing and that the dismissal "is tantamount to holding Section 2911(b) and Section 2937 immune from judicial review." (Appellants' Opening Br. at 19.) We agree.

### 1. Injury-in-Fact

When standing is contested, "the injury-in-fact element is often determinative." *In re Schering Plough Corp.*, 678 F.3d at 245 (quoting *Toll Bros., Inc. v. Twp. of Readington*, 555 F. 3d 131, 138 (3d Cir. 2009)) (internal quotation marks omitted). As earlier noted, injury-in-fact requires "an invasion of a legally protected interest which is (a) concrete

---

which deals with the nomination papers of minor political parties, not § 2911, which is challenged here and regulates the nomination process for political bodies. 433 F. App'x at 90.

29

and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560-61 (citations omitted) (internal quotation marks omitted). The injury "must 'affect the plaintiff in a personal and individual way.'" *In re Schering Plough Corp.*, 678 F.3d at 245 (quoting *Lujan*, 504 U.S. at 560 n.1). The Supreme Court has instructed that "the injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis*, 554 U.S. at 734. However, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (second alteration in original) (internal quotation marks omitted) (citation omitted); *cf. Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) ("A plaintiff … lacks standing if his 'injury' stems from an indefinite risk of future harms inflicted by unknown third parties.").

The District Court determined that the Aspiring Parties' alleged injury "could not be considered a real, immediate, and direct injury." *Constitution Party*, 2013 WL 867183, at \*7 (internal quotation marks omitted). The Court downplayed their claims as being based on "the *possibility* of assessed costs," and it characterized the threat of costs as merely "conjectural or hypothetical." *Id*. Further, the Court stated that it was "not persuaded by the [Aspiring Parties'] arguments that because non-major party candidates have been assessed costs in the past, their future candidates will be assessed costs." *Id*. It also concluded that the Aspiring Parties set forth no allegation that a Pennsylvania court would actually assess costs against a candidate who does not engage in misconduct. *Id*.

30

In all of that, the District Court overlooked the Aspiring Parties' allegations and evidence, as we have already described. Moreover, it took no account of the principle that the factual support needed "to establish standing depends considerably upon whether the plaintiff is himself an object of the action ... . If he is, there is ordinarily little question that the action or inaction has caused him injury … ." *Lujan,* 504 U.S. at 561-62; *see also* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 894 (1983) ("Thus, when an individual who is the very object of a law's requirement or prohibition seeks to challenge it, he always has standing."). Here, the portions of the Pennsylvania election code challenged by the Aspiring Parties directly regulate the conduct of political bodies and their candidates. 25 Pa. Cons. Stat. §2911 ("Nominations by political bodies"); *id.* § 2937 ("Objections to nomination petitions and papers"). Under § 2911(b), political bodies, *i.e.*, organizations which, like the C.G.L. Parties, did not attain two percent of the vote received by the statewide candidate with the most votes in the prior election, are the explicit objects of the nomination-paper requirements. The statute sets forth what such organizations must do to appear on the general election ballot. Thus, to say that the Aspiring Parties are not objects of the scheme is untenable. That is especially so since the Commonwealth's merits arguments – which are broadly referenced throughout its briefing – plainly demonstrate that political bodies are indeed the target of § 2911(b), which operates in conjunction with § 2937.[18] The

---

[18] As mentioned above, § 2872.2 establishes the nomination-paper mandate for minor political parties. It is

Commonwealth will contend on the merits, as it has in the past, that Pennsylvania has an interest in preventing minor political players from cluttering the ballot. *See Rogers*, 468 F.3d at 194 ("The state interests here are avoiding ballot clutter and ensuring viable candidates."). It is inconsistent to the point of whiplash to suggest that minor players like the Aspiring Parties are properly subject to the challenged provisions because there is a legitimate government interest in limiting their access to the ballot, *id.*, but then to contend in the standing context that those same provisions are not, in fact, aimed at the very same parties.

In addition, the District Court gave little consideration to noteworthy developments in Pennsylvania law in the last ten years that affect our analysis here: first, highly publicized awards of costs against would-be candidates; second, new case law allowing such costs to be awarded despite the good

---

true that "both major party candidates seeking to appear on a primary election ballot, and minor party candidates seeking to appear on a November election ballot, are subject to § 2937." (Appellee's Letter filed March 19, 2014.) That makes little practical difference, however, as political bodies, such as the Aspiring Parties, are the sole object of § 2911. Nor does it matter under the language of *Lujan* if some few others are the statutory objects of § 2937, as long as the plaintiffs themselves are the object of the statute. *See Lujan,* 504 U.S. at 561 (stating that the standing inquiry "depends considerably upon whether the plaintiff is himself an object of the action"). And, we will not be so blind as to ignore the uncontested facts set forth in the Aspiring Parties' declarations, which establish how § 2937 in practice has been applied only to non-major parties.

32

faith efforts of people facing challenges to nomination papers; and, third, repeated threats to pursue similar cost awards against the C.G.L. Parties' candidates.

As to the first point, it is no accident that this case arises now. The Commonwealth itself highlights in its briefing the recent increase in litigation surrounding Pennsylvania's election code, saying that "there are five appellate decisions, rendered between 2006 and 2011, that cannot be ignored." (Appellees' Br. at 11.) The Aspiring Parties are not ignoring them and neither will we. It matters greatly how § 2937 has been applied in the last decade, a period in which that statute has been a vehicle for imposing significant litigation expenses on non-major parties and their candidates. *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. __ (2014) (slip op., at 14) (finding injury-in-fact where there was a substantial "threat of future enforcement," noting that, "[m]ost obviously, there is a history of past enforcement here").

Next, the Pennsylvania Supreme Court only recently addressed the standard for deciding when to award costs under § 2937. In *In re Farnese*, the court said that there are various "factors relevant to the discretionary assessment of whether to shift costs." 17 A.3d at 372. It looked at the statutory statement that when a nomination petition or paper is dismissed, the costs of the proceedings associated with the dismissal can be assessed against a candidate as is deemed just, and it interpreted the word "just" to include cases of "fraud, bad faith, or gross misconduct," but not to be limited to that kind of malfeasance. *Id*. In other words, it appears that a candidate can proceed in good faith to seek a spot on the ballot and still be subjected to high litigation costs.

33

Whether that interpretation of § 2937 leaves the standard for cost shifting unconstitutionally vague and overbroad is yet open to debate.[19]

What is not open to debate on the record before us, viewed in the plaintiff-friendly light that it must be, is that the award of costs in past cases has had a chilling effect on protected First Amendment activity. Political actors have used the recent precedents from Pennsylvania courts as a cudgel against non-major parties and their candidates. According to the Aspiring Parties, Democrats and Republicans – acting strategically, as one would expect of people in high-stakes political contests – have tried and will continue to try to block anyone from the ballot box who might strip votes from their favored candidates. As quoted

_____

[19] To bolster its determination that future harm was too speculative, the District Court here also relied on the fact that, in the two cases where costs were imposed pursuant to § 2937, "the Pennsylvania courts found that the candidates had participated in fraud, bad faith, or similar inappropriate conduct prior to assessing costs." *Constitution Party*, 2013 WL 867183, at *7. The Court went on to state that "[t]he Plaintiffs make no allegation a court will assess costs against a candidate who acted in good faith." *Id.* That statement transforms the outcome in *Farnese* into the kind of bright-line standard (good faith on one side and bad faith on the other) that was expressly rejected by the Pennsylvania Supreme Court. *In re Farnese*, 17 A.3d at 371. The Aspiring Parties' argument is not that, under *Farnese*, courts will start randomly ordering costs but that citizens do not know what conduct will lead to such orders. It is the alleged uncertainty itself that leads to the Aspiring Parties' injury.

earlier, a shrewd lawyer engaged on behalf of three private challengers affiliated with the Republican Party expressly threatened to move for upwards of $100,000 in costs if the Libertarian Party went forward with its nomination efforts. Referencing *Rogers* and *Nader*, the lawyer said, "[t]hese costs are comparable to the costs awarded in recent years by the Commonwealth Court in similar nomination paper challenges." (J.A at 87.) The threat had the intended effect, and the Libertarian Party withdrew its 2010 nomination papers. The Democratic Party similarly pushed the Green Party's candidate out of the race for United States Senate in 2010, when the Democratic candidate filed a challenge pursuant to § 2937. The threat of cost shifting, entirely believable in light of recent history, chills the Aspiring Parties' electioneering activities.

That is the injury, and cogent precedent shows it to be intolerable. In *Susan B. Anthony List v. Driehaus*, the Supreme Court this term unanimously held that political advocacy groups had established injury-in-fact, in part because the threat of future prosecution, which was "bolstered by the fact that authority to file a complaint" was not limited to a government actor, could be used as a political tool. *Susan B. Anthony List*, 573 U.S., at __ (slip op., at 14). The Court stated that, "[b]ecause the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, *there is a real risk of complaint from, for example, political opponents*." *Id.* (emphasis added). [20]

---

[20] Although the opinion in *Susan B. Anthony List* addressed a criminal statute, the Supreme Court said that it would "take the threatened [election] Commission

35

In short, as we have already discussed, there are ample allegations of a present and continuing injury, despite the Commonwealth's desire to minimize the problem as involving nothing more than "potential financial burdens." (Appellees' Br. at 39.) It is quite true that a "chain of contingencies" amounting to "mere speculation" is insufficient for an injury-in-fact. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013). But the injury alleged by the Aspiring Parties is not a speculative series of conditions. Construed in the light most favorable to the Aspiring Parties, their Complaint establishes that, when they submit nomination papers as they must under § 2911(b), they face the prospect of cost-shifting sanctions, the very fact of which inherently burdens their electioneering activity. *See Susan B. Anthony List*, 573 U.S., at __ (slip op., at 15-16) (noting the burden imposed on electoral speech, including "divert[ing] significant time and resources to hire legal counsel"). They have produced sworn and uncontested declarations that their plans for seeking public office are directly impeded by the

---

proceedings into account because administrative action, like arrest or prosecution, may give rise to harm sufficient to justify preenforcement review." 573 U.S. __ (2014) (slip op., at 15). The Court did not decide if such a threat, alone, gives rise to an injury-in-fact, because the Commission proceedings at issue in that case were "backed by the additional threat of criminal prosecution." *Id.* The Pennsylvania statute, by contrast, does not provide for criminal sanctions; however, the Court's analysis of threats used to stifle electoral activity informs us here.

relevant provisions of the election code.[21]    "Because

[21] Our dissenting colleague dismisses the Aspiring Parties' efforts to have their day in court as founded solely on subjective fears. (Dissent Op. at 1.). For the reasons already outlined, we disagree with that characterization, as we do the dissent's reliance on *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013). While our colleague is troubled by a supposed chain of contingencies (Dissent Op. at 3-4) – three links long – *Clapper*'s statement that injury must certainly be impending does not mean that Aspiring Party candidates must certainly be assessed costs. (*Id*. at 4.) It is enough that there is a reasonable evidentiary basis to conclude that the Aspiring Parties' electioneering activity will be limited by Pennsylvania's electoral scheme. The credible threat of costs imposes the injurious restraint on political activity.

Moreover, our colleague's reliance on *Clapper* overlooks at least three ways in which that case is distinguishable. First, *Clapper* addresses the unique realm of national security in which peculiar balance-of-power concerns, which are not present here, abound. *See Clapper*, 133 S. Ct. at 1147 ("[W]e have often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs."). Second, the Court's holding that respondents did not have standing was based on a detailed review of the particular statutory scheme at issue in that case, which, by the Court's count, included five levels of safeguards and contingencies. *See id*. at 1148-50 (discussing the complex operation of the Foreign Intelligence Surveillance Act as applied to the respondents). Third, and most importantly, the law at issue in *Clapper* did not directly regulate the respondents. *Id*. at 1148 ("[R]espondents' theory

campaign planning decisions have to be made months, or even years, in advance of the election to be effective, the plaintiffs' alleged injuries are actual and threatened." *Miller v. Brown*, 462 F.3d 312, 317-18 (4th Cir. 2006); *see also New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1500–01 (10th Cir. 1995) (finding injury from the existence of a New Mexico statute relating to campaign expenditures that caused a congressman to engage in fundraising differently than he otherwise would have, even though the congressman had not yet announced his intention to run for

necessarily rests on their assertion that the Government will target *other individuals* – namely, their foreign contacts."). This third point alone makes *Clapper* inapposite and renders any language from it regarding subjective speculation or chains of contingencies inapplicable here. The Supreme Court in fact relied on that very point to distinguish other standing cases from the facts of *Clapper*. *See id.* at 1153. ("As an initial matter, none of these cases holds or even suggests that plaintiffs can establish standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part."); *see also id.* at 1150 ("[R]espondents can only speculate as to whether *their own communications* … would be incidentally acquired."). In contrast, the Pennsylvania scheme compels the Aspiring Parties to file nomination papers and directly regulates their conduct in doing so.

Finally, it bears repeating that, in this case, we are addressing a fundamental First Amendment right to political participation – not an inconvenience or burden, but wholesale disenfranchisement.

office).

As those are the undisputed facts before us, the Aspiring Parties have established injury-in-fact. We thus consider whether they also satisfy the other prerequisites for standing: causation and redressability.[22]

---

[22] To the extent that a separate declaratory judgment standing analysis is required, *see Khodara Env't, Inc. v. Blakey,* 376 F.3d 187, 194 (3d Cir. 2004) (separately reviewing "the standing requirements for a declaratory judgment case" and Article III standing) – something we have not expressly held but to which the Commonwealth devotes a great deal of space in its briefing – we reject the Commonwealth's argument against such standing. Although the Commonwealth contends that standing for declaratory judgment is an "extra layer to the analysis," (Appellee's Br. at 31) we have often framed the inquiry as part of the injury-in-fact analysis. "A plaintiff seeking a declaratory judgment must possess constitutional standing but need not have suffered 'the full harm expected.'" *Khodara Env't, Inc.,* 376 F.3d at 193 (quoting *St. Thomas–St. John Hotel & Tourism Ass'n v. V.I.,* 218 F.3d 232, 240 (3d Cir. 2000)). Such a plaintiff "has Article III standing if 'there is substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* at 193-94 (quoting *St. Thomas– St. John Hotel & Tourism Ass'n,* 218 F.3d at 240). The Commonwealth claims that the interests of the parties are not adverse because Commonwealth officials only accept nomination papers for filing and have no role in any challenge posed to the papers. Enforcement of the law can, however, establish an adverse interest. *See St. Thomas–St.*

## 2. *Causation*

The District Court held that, even if the Aspiring Parties could establish injury-in-fact, they had failed to establish causation. *Constitution Party*, 2013 WL 867183, at *7-8. A federal court may "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). The Commonwealth argues that, because private parties are the ones who bring lawsuits objecting to the nomination papers, the independent decisions of those objectors constitute a break in any actionable link to the Commonwealth's conduct. Essentially, the argument is that Commonwealth officials only accept the nomination papers for filing, and they do none

---

*John Hotel & Tourism Ass'n,* 218 F.3d at 240-41 ("The parties' interests in this action could not be more adverse, as the government and employees, both defendants here, seek to enforce the protections provided by the [statute], and the employers … seek to avoid enforcement of those protections."). The Commonwealth also asserts that the controversy is not of "sufficient immediacy and reality" because the results of the 2012 nomination paper process depended on a "host of contingencies." (Appellee's Br. at 34.) That argument fails for the same reasons discussed above regarding the immediate nature of the injury-in-fact. The Aspiring Parties satisfy the prerequisites to bring a declaratory judgment action. Having said that, we reiterate that we are not deciding the merits and express no opinion on whether a declaratory judgment should ultimately issue.

40

of the things about which the Aspiring Parties complain. We cannot agree with that self-serving characterization.

Causation in the context of standing is not the same as proximate causation from tort law, and the Supreme Court has cautioned against "wrongly equat[ing] … injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear,* 520 U.S. 154, 168–69 (1997). Moreover, there is room for concurrent causation in the analysis of standing, *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013) (holding that if a petition witness residency requirement was "at least in part responsible for frustrating [plaintiff's] attempt to fully assert his First Amendment rights in Virginia, the causation element of *Lujan* is satisfied"), and, indeed, "an indirect causal relationship will suffice, so long as there is a fairly traceable connection." *Toll Bros. Inc.*, 555 F.3d at 142 (citations omitted) (internal quotation marks omitted). There are two types of cases in which standing exists even though the direct source of injury is a third party:

> First, a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action. Second, standing has been found where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and likelihood of redress.

*Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 116 (D.D.C. 2013) (alterations in original) (citations omitted) (internal quotation marks omitted). At issue here is causation of the second type.

The District Court concluded that the Aspiring Parties provided "nothing more than conjecture and conclusory assertions" to support their allegation that candidate recruitment problems stemmed from § 2937 costs. *Constitution Party*, 2013 WL 867183, at *8. It also held that "any multitude of other factors" could have resulted in candidate reluctance. *Id.* Again, this largely ignores the Complaint and the declarations submitted with it. To the extent that the Court addressed the Aspiring Parties allegations and proof, it certainly did not take them as true. Candidates and canvassers refuse to participate in the political process because, they have declared, they cannot bear the risk of litigation costs imposed under § 2937. That is a direct and un-refuted statement of causation. Because the "mere existence of the … law causes these [electoral] decisions to be made differently than they would absent the law … the standing inquiry's second requirement of a causal connection between the plaintiffs' injuries and the law they challenge" is satisfied. *Miller*, 462 F.3d at 318 (citing *Simon,* 426 U.S. at 41–42).

The Commonwealth cannot hide behind the behavior of third parties when its officials are responsible for administering the election code that empowers those third parties to have the pernicious influence alleged in the Complaint. To hold otherwise would mean that political bodies could never seek prospective relief because the objectors to their nomination papers will always be unknown

42

until it is too late to actually obtain a meaningful injunction. We cannot accept the Commonwealth's argument that the only way to challenge the statutory scheme is in a lawsuit over a particular set of nominating papers. Oral Arg. Tr. at 47:12-25. By the impossible logic of the Commonwealth, the Aspiring Parties will never have a prospective remedy for their injury, because there will never be standing, because there will never be causation, because the third parties who might challenge their nomination papers are always unknown until the opportunity for prospective relief has passed.[23] *Cf. Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 633 (2007) (Scalia, J., concurring in the judgment) ("The rule of law is ill served by forcing lawyers and judges to make arguments that deaden the soul of the law, which is logic and reason."). All the while, the C.G.L. Parties allege that they cannot advance from "political body" status precisely because they cannot recruit volunteers to even gather signatures.

Under this specific statutory scheme, it is not the actions of other actors alone that cause the injury. Those third parties could take no action without the mechanisms by which the Commonwealth's officials oversee the election code provisions at issue here. Therefore, "the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct,

---

[23] Some may say this goes too far and that the Aspiring Parties need not wait until a challenge is brought, but could come to court as soon as there are credible threats from third-party challengers. However, given the months and years of strategy that go into campaigning in our modern era, forcing political bodies to live under such uncertainty is, as already addressed above, subject to challenge.

43

leaving little doubt as to causation and likelihood of redress." *Bloomberg L.P.*, 949 F. Supp. 2d at 116 (alteration in original) (internal quotation marks omitted).

In fact, in reviewing other election challenges, it appears to be standard operating procedure for plaintiffs to bring these type of suits against the officials who administer the state election system, which here includes the Secretary of the Commonwealth and state election commissioners. *See Belitskus*, 343 F.3d at 638 (finding standing where the defendants were the Secretary of the Commonwealth and the Commissioner for the Bureau of Commissions, Elections and Legislation). For example*,* in *American Party of Texas v. White*, 415 U.S. 767, 770 (1974), plaintiffs brought claims "against the Texas Secretary of State seeking declaratory and injunctive relief against the enforcement of various sections of the Texas Election Code," and the Supreme Court undertook no standing analysis other than to note that other minor parties initially involved in the litigation lost standing during the proceedings, *id.* at 770 n.2. That the Supreme Court went straight to the merits of a similar ballot-access claim, brought for declaratory and injunctive relief against state officials charged with administering the election code, is not lost on us. *See id.* at 780. It implies the propriety of finding standing here, where the defendants exercise the same kinds of government authority. The Aspiring Parties have established that their injury-in-fact can fairly be traced to the actions of the Commonwealth officials, and the causation element is satisfied.

*3.      Redressability*

44

Finally, standing requires that there be redressability, which is "a showing that 'the injury will be redressed by a favorable decision.'" *Toll Bros. Inc.*, 555 F.3d at 142 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The District Court did not address this requirement, *Constitution Party*, 2013 WL 867183, at * 8, nor do the parties give it much consideration. We agree that it does not need extensive attention. Redressability here follows the rest of the standing analysis primarily because, by establishing causation, the Aspiring Parties have also established redressability. *See Toll Bros. Inc.*, 555 F.3d at 142 (finding that redressability is "closely related to traceability [causation], and the two prongs often overlap"). If the Commonwealth officials do not enforce the election provisions at issue, then the Aspiring Parties will not be burdened by the nomination scheme embodied in §§ 2911(b) and 2937, allowing the C.G.L. Parties' candidates to run for office and build functioning political parties.[24] The Aspiring Parties have therefore alleged sufficient facts to establish standing.[25]

----

[24] We are not suggesting that framing a remedy, should that ever become necessary, would be a simple matter. We are only holding that the redressability prong of a constitutional standing analysis is satisfied under the present circumstances.

[25] The Aspiring Parties also contend that it was error for the District Court not to separately consider their § 2937 facial challenge. "Litigants asserting facial challenges involving overbreadth under the First Amendment have standing where 'their own rights of free expression are [not] violated' because 'of a judicial prediction or assumption that

45

## V.    Conclusion

While the merits of their claims must await a hearing on some future day, the Aspiring Parties have standing to pursue their claims and have them heard.  The order of the District Court dismissing the Complaint will be reversed.

---

the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 238 (3d Cir. 2010) (alteration in original) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612 (1973)); *Amato v. Wilentz,* 952 F.2d 742, 753 (3d Cir. 1991) ("The Supreme Court rather freely grants standing to raise overbreadth claims, on the ground that an overbroad ... regulation may chill the expression of others not before the court.").  A separate analysis of the § 2937 facial claim and the statute's impact on parties not before the Court is unnecessary at this juncture because we have determined that the Aspiring Parties have standing to bring all three claims in their Complaint.

Lastly, the Commonwealth argues that the controversy was not ripe when it was filed.  The ripeness inquiry involves various considerations including whether there is a "sufficiently adversarial posture," the facts are "sufficiently developed," and a party is "genuinely aggrieved." *Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003).  Although the District Court did not reach the question of ripeness, we hold that, for the reasons discussed above, the case was ripe for adjudication.

The Constitution Party of Pennsylvania, et al.
v. Carol Aichele, et al.
No. 13-1952

_____

AMBRO, Circuit Judge, dissenting

Were the law on standing a blank slate, perhaps the plaintiffs[1] here would have standing.  It is not, and they do not.  Instead, precedent establishes clear and exacting standards for when fear of a possible harm generates standing.  Because the plaintiffs have not met those standards, I respectfully dissent.

As the Supreme Court stated more than four decades ago, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . ." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).  Here, the plaintiffs have specifically and with supporting declarations alleged that they and their members subjectively fear the future imposition of costs.  Contrary to the majority's position, our task is to determine

---

[1] As discussed in the majority opinion, it is difficult to select an appropriate short-hand label for the plaintiffs in this case, who include the Constitution Party of Pennsylvania, the Libertarian Party of Pennsylvania, and the Green Party of Pennsylvania, as well as several party officials and current or former candidates.  The majority's preferred name, "Aspiring Parties," seems fit only for the organizations (and even there it may be gratuitously laudatory).  Because the standing analysis in cases like this one focuses on the claims made by a party in its complaint and supporting documents, I have used the term "plaintiffs" rather than "appellants."

whether that subjective fear has a sufficient objective basis to render it an injury sufficient to confer standing to sue today.

*Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013), is particularly instructive in conducting this evaluation. There a variety of lawyers and activist groups brought a constitutional challenge to expanded surveillance under an amended portion of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1881a, that they feared might intercept their communications given their work with targeted groups. *Id.* at 1145. The Second Circuit, reversing the District Court, found standing based on both what the plaintiffs termed an "objectively reasonable likelihood" of future interception and the actions of the plaintiffs based on fear of that interception. *Id.* at 1146.

The Supreme Court reversed the Circuit Court, ruling that the plaintiffs did not have standing. The threat of future surveillance was too speculative to create standing because it "relie[d] on a highly attenuated chain of possibilities . . . ." *Id.* at 1148. As to the applicable test, "the Second Circuit's 'objectively reasonable likelihood' standard is inconsistent with our requirement that 'threatened injury must be *certainly impending* to constitute injury in fact.'" *Id.* at 1147 (emphasis added) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Instead, that "Circuit's analysis improperly allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not 'fanciful, paranoid, or otherwise unreasonable.'" *Id.* at 1151 (quoting *Amnesty Int'l USA v. Clapper*, 638 F.3d 118, 134 (2d Cir. 2011)).

My majority colleagues make the same error, implicitly allowing the plaintiffs to establish standing without showing a sufficiently certain harm. Their opinion states: "The threat of cost shifting, *entirely believable in light of*

2

*recent history*, chills the Aspiring Parties' electioneering activities." Maj. Op. at 35 (emphasis added). I do not doubt that the threat of cost shifting is "entirely believable," *id.*, nor, for the sake of argument, do I doubt that the plaintiffs in good faith believe costs would be assessed if the plaintiff organizations were to run candidates. Yet this fear alone is simply not enough to create standing.

Instead, to generate standing, cost assessments must be "certainly impending." They are not in at least three ways. First, assuming that a candidate were to collect and submit the necessary signatures (something the candidate is responsible for), someone would have to challenge his or her nomination papers. Even if it is true that "[t]he likelihood of future legal challenges is hardly farfetched," Maj. Op. at 27 n.15, a "hardly farfetched" threat is not enough. The complaint alleges that in recent years some non-major party candidates have been challenged while others have not been challenged (in particular, the Libertarian Party nominees in 2008). That some but not all recent candidates have been challenged does not support the inference that any particular nomination will inevitably be challenged in the future.

Second, if a nomination were challenged, the candidate would have to lose before costs could be imposed—*i.e.*, his or her nomination papers would have to be disqualified. Based on the complaint and supporting declarations, there is no basis for concluding that successful defenses against challenges are impossible or even improbable, particularly when (as the plaintiffs repeatedly assert) a candidate believes in good faith that he or she submitted sufficient valid signatures. The mere fact of a challenge does not make disqualification a *fait accompli*.

Third, even if a challenge is successful, costs can be imposed under *In re Farnese*, 17 A.3d 357 (Pa. 2011), only if

3

a court deems such an assessment "just" after considering "the particular facts, the nature of the litigation, and other considerations as may appear relevant." *Id.* at 372. A cost assessment is not automatic or inevitable after a challenge is lost, but rather is the subject of a case-specific balancing process by a neutral state court. Although *Clapper* requires certainty, the majority inexplicably writes that it is post-*Farnese* cost assessments' "*alleged uncertainty* itself that leads to the Aspiring Parties' injury." Maj. Op. at 35 n.19 (emphasis added). Yet, as the majority notes, the provision allowing cost assessments has been law for over 75 years and the signature threshold has been unchanged for over 40 years. *See id.* at 12 (citing *People's Party v. Tucker*, 347 F. Supp. 1, 2 & n.2 (M.D. Pa. 1972)). In all that time, the plaintiffs have identified just two instances in which a Pennsylvania court has assessed costs against a non-major party candidate under this provision, each involving particular facts that cause courts to "send a message" by way of a sanction. The first major cost award involved widescale fraud, while the second involved repeated failure to comply with court orders. These two cases, particularly in light of *Farnese*, do not support the conclusion that a candidate who is challenged and loses will inevitably be assessed costs. What we have instead is, like *Clapper*, a "highly attenuated chain of possibilities [that] does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 133 S. Ct. at 1148.

Nor can the plaintiffs create standing by acting on their subjective fear. Their filings are filled with language suggesting coercion, saying that would-be candidates have been "forced" or "compelled" to withdraw or not to run and referring to "threats" to seek costs by people associated with major parties. The *Clapper* plaintiffs made analogous claims, such as "that the threat of surveillance sometimes compels them to avoid certain e-mail and phone conversations, to 'tal[k] in generalities rather than specifics,' or to travel so that

4

they can have in-person conversations."  *Id.* at 1151 (alterations in original) (citations omitted).  The Supreme Court roundly rejected those contentions, writing that "respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* The same applies here: actions the plaintiffs or their "member-supporters" have taken or not taken out of fear of cost assessments do not create standing for the same reason that fear itself does not.

In response, my majority colleagues argue without citation that "[i]t is enough that there is a reasonable evidentiary basis to conclude that the [plaintiffs'] electioneering activity will be limited by Pennsylvania's electoral scheme."  Maj. Op. at 37 n.21.  In their view, so long as there is a "credible threat," *id.*, of some negative consequence for the exercise of one's First Amendment right, a plaintiff can show standing by specifically alleging that he or she will not exercise the right out of subjective fear that consequence could occur.  This is not the law, and the majority's purported bases for distinguishing *Clapper*, which amount to the conclusion that our case does not involve identical facts, are unavailing.  Thus I turn to what *Clapper* teaches.[2]

_____

[2] I read the Supreme Court's opinion in *Susan B. Anthony List v. Driehaus*, 573 U.S. ___ (2014), as simply an extension of the long-established special standing analysis in cases involving potential criminal prosecution for violating a prohibition on speech.  *See id.* (slip op. at 16) ("The burdensome Commission proceedings here are backed by the additional threat of criminal prosecution. We conclude that the combination of those two threats suffices to create an

5

I know no basis for concluding that *Clapper*'s reach is limited to national security cases beyond the vague half-sentence quoted by the majority. *Clapper* relies, with the exception of *Laird*, overwhelmingly on standing cases from outside the national security context. For the central proposition that a threatened harm must be certainly impending, the Court relied on *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), and a case where one death row inmate attempted to assert standing on behalf of another death row inmate, *Whitmore v. Arkansas*, 495 U.S. 149 (1990). *See Clapper*, 133 S. Ct. at 1147 (citing *Lujan*, 504 U.S. at 565 n.2); *id.* (citing *Whitmore*, 495 U.S. at 158). To conclude that costs incurred out of fear of a non-certain harm do not generate standing, the Court in *Clapper* looked to *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976), a tax dispute among several states, and *National Family Planning & Reproductive Health Association, Inc. v. Gonzales*, 468 F.3d 826 (D.C. Cir. 2006), a challenge to grant restrictions on family planning services. *See Clapper*, 133 S. Ct. at 1151. This range of sources strongly suggests that the Court meant for us to apply *Clapper* to standing decisions well beyond the narrow national security context.

---

Article III injury under the circumstances of this case."); *see also, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("When contesting the constitutionality of a *criminal* statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" (alterations in original) (emphasis added) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974))). This case involves neither the threat of criminal prosecution nor a prohibition of any kind, and thus the *Babbit-Steffel* standing analysis does not apply.

Moreover, in *Clapper*'s "detailed review of the particular statutory scheme at issue," Maj. Op. at 38 n.21, the Court did not reach its conclusion based on some isolated, idiosyncratic feature of the FISA amendments. It reviewed the statute to determine whether it made the purported harm certainly impending and concluded it did not. *See* 133 S. Ct. at 1148-50. A thorough review of the statutory scheme here reveals similar uncertainty and thus, I believe, leads to the same conclusion.

The majority also argues that *Clapper* does not apply because the plaintiffs there alleged that their First Amendment rights were burdened by possible surveillance of their contacts, *see id.* at 1148, while the plaintiffs here fear costs that might be assessed against them and their candidates directly. *See* Maj. Op. at 38 n.21. It is a distinction without a difference. That the *Clapper* plaintiffs feared government action against others rather than directly against themselves was simply one among many reasons the Court held that the harm *to the plaintiffs* from this hypothetical surveillance was too speculative to generate standing. *See* 133 S. Ct. at 1148. It was not, however, the basis of the Supreme Court's conclusion, established in standing law since *Laird*, that a subjective chilling effect in general is insufficient for standing unless the feared harm is certainly impending. *See id.* at 1152 (quoting *Laird*, 408 U.S. at 13-14). This rule clearly still applies to the plaintiffs in our case.

The majority's description of the statutory scheme as "not an inconvenience or burden, but wholesale disenfranchisement," Maj. Op. at 38-39 n.21, hyperbolizes the law's actual effects. The plaintiffs themselves have repeatedly characterized the Pennsylvania laws' collective effect as a "burden" on their constitutional rights but have not come close to alleging Pennsylvania "disenfranchises" them. *See* J.A. at 44 ("The application of Section 2911(b) and

7

Section 2937 has severely impacted Plaintiffs and continues to impose severe burdens on them."); *id.* at 47 ("Section 2911(b) and Section 2937, as applied, violate Plaintiffs' freedoms of speech, petition, assembly, and association for political purposes, and their right to due process of law, as guaranteed by the First and Fourteenth Amendments, by imposing or threatening to impose substantial financial burdens on them . . . ."); *id.* at 49 ("The threat of incurring such financial burdens injures Plaintiffs.").

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560. A subjective fear alone, no matter how deeply perceived, does not create a case or controversy the Constitution empowers us to hear unless that fear has a sufficient objective basis. The majority believes that the plaintiffs—who have alleged only two instances ever of cost assessments against non-major-party candidates and speculate costs may be assessed again—have shown such a basis here. I disagree because "hypothetical future harm that is not certainly impending" does not confer standing. *Clapper*, 133 S. Ct. at 1143. Thus I respectfully dissent.